USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  __2/24/2015__

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------x

ROBERTO CIAPRAZI,                             :       **REPORT AND**
                                                      **RECOMMENDATION**
                              Plaintiff,      :       **TO THE HONORABLE**
              - against -                             **VALERIE E. CAPRONI**
                                              :
BRIAN FISCHER, et al.,                                13cv4967-VEC-FM
                                              :
                              Defendants.
---------------------------------------------------------x

**FRANK MAAS**, United States Magistrate Judge.

Pro se plaintiff Roberto Ciaprazi ("Ciaprazi") is an inmate at the Sing Sing

Correctional Facility ("Sing Sing"), which is under the control of the New York State

Department of Corrections and Community Supervision ("DOCCS").  He brings this civil

rights action pursuant to 42 U.S.C. § 1983 ("Section 1983").  In his amended complaint

(ECF No. 5 ("Amended Complaint" or "Am. Compl.")), Ciaprazi asserts twenty-four

federal and state law claims against nineteen DOCCS employees, including Brian Fischer

("Fischer"), the former DOCCS Commissioner;[1] Daniel F. Martuscello III

("Martuscello"), the DOCCS Deputy Commissioner of Administrative Services; Joseph

F. Bellnier ("Bellnier"), the DOCCS Deputy Commissioner of Correctional Facilities

(collectively, the "Albany Defendants"); and sixteen Sing Sing officials and correction

---

[1]       Fischer was DOCCS Commissioner between 2007 and 2013.  (Am. Compl. ¶ 8).
Fischer retired from that position in April 2013.  See Leg. Res. K257-2013 (N.Y. 2013)
(available at http://open.nysenate.gov/legislation/bill/K257-2013).  Prior to serving as the
Commissioner, Fischer also served as the Superintendent of Sing Sing for some period of time.
See, e.g., Odom v. Calero, No. 06 Civ. 15527 (LAK) (GWG), 2008 WL 2735868, at *1
(S.D.N.Y. July 10, 2008).

officers (the "Sing Sing Defendants" and, together with the Albany Defendants, the

"Defendants").  The Defendants are sued in their individual capacities for monetary

damages and in their official capacities for declaratory and injunctive relief.

The Defendants have moved to dismiss certain aspects of the Amended

Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (See ECF

No. 91).  For the reasons that follow, that motion should be granted in part and denied in

part.

## I.     Factual Background

The following facts derived from the Amended Complaint, Ciaprazi's

opposition papers, and the exhibits annexed thereto, (see ECF No. 102 ("Pl.'s Opp.")), are

presented in the light most favorable to Ciaprazi and, for present purposes, are assumed to

be true.[2]

### A.     Conditions of Confinement in Building 5

Between 2007 and 2012, Ciaprazi was lodged in Building 5 at Sing Sing

("Building 5").  (Am. Compl. ¶¶ 37, 156).  Building 5 is not equipped with air-

conditioning.  (Id. ¶ 38).  In 2012, the Building 5 cell windows were replaced with

windows designed for buildings equipped with air-conditioning systems.  (Id.).  As a

consequence, these windows could be opened only to a limited extent, thereby reducing

---

[2]     See, e.g., Pagan v. Westchester Cnty., No. 12 Civ. 7669 (PAE) (JCF), 2014 WL
982876, at *10 (S.D.N.Y. Mar. 12, 2014) (on a Rule 12(b)(6) motion, a court may "consider
documents that are referenced in the complaint" as well as those a plaintiff "relied on in bringing
suit").

the amount of fresh air reaching each cell.  (Id. ¶¶ 39-40).  This lack of ventilation was exacerbated by a "thick and extremely dense metal mesh screen" installed in each window, and an ineffective mechanical ventilation system that – to make matters worse – was out of order during the summer of 2012.  (Id. ¶¶ 41, 53-54).  The conditions created by these improper windows, including poor air quality and circulation, unreasonably high cell temperatures, and unmanageable humidity, caused Ciaprazi and other inmates in Building 5 to suffer from "high body temperature[s], headaches, dizziness, . . . disruption of sleep, dehydration, feeling[s] of suffocation and severe personal discomfort."  (Id. ¶¶ 43-50, 55).

On August 7, 2012, Ciaprazi sent a formal complaint to Fischer, in which he described in great detail the temperature and air quality problems plaguing Building 5 and requested that certain specific corrective measures be taken.  (Id. ¶ 57; Ex. 1).[3]  On October 17, 2012, Martuscello responded on Fischer's behalf, explaining that while the newly-installed windows were "markedly different [than] the dilapidated windows which existed prior to the renovation," they were, in fact, consistent with the "current correctional industry standard" and appropriate for Building 5.  (Ex. 2 at 1).  Accordingly, Martuscello denied the relief sought by Ciaprazi.  (Id. at 2; Am. Compl. ¶ 58).

Based on these facts, Ciaprazi has asserted Eighth Amendment claims against both Fischer and Martuscello for "installing or approving" the windows in

---

[3]     "Ex." refers to the exhibits annexed to Ciaprazi's opposition papers.  (Pl.'s Opp.).

question, (Count One), and failing to remedy the conditions created by those windows, (Count Two).

B.      Eviction From Building 5

Building 5 is a "preferred housing unit for prisoners with particular program assignments, such as law library clerks." (Am. Compl. ¶ 37). Beginning in 2011, "the practically all-black correction staff in Building 5" commenced a coordinated attempt to evict white inmates from Building 5 through the issuance of "false or baseless disciplinary reports." (Id. ¶ 59). On October 17, 2011, Ciaprazi described this "pattern of racially motivated actions" in a written complaint addressed to Fischer on which numerous other federal and state officials were copied. (Id. ¶ 66; Ex. 9). Kenneth Decker, DOCCS Acting Deputy Commissioner, responded on Fischer's behalf, stating that he was forwarding Ciaprazi's complaint to the Superintendent of Sing Sing because Ciaprazi had failed to pursue his complaint, as required, "at the facility level." (Ex. 10). Ciaprazi's complaints concerning the harassment and racial abuse of white inmates were investigated by Sing Sing staff and determined to be unfounded. (Am. Compl. ¶ 66; Exs. 11-12; Pl.'s Opp. at 14).

On August 14, 2012, following a purported nighttime altercation with defendant McCants, a Sing Sing sergeant, defendant Miller, a Sing Sing correction officer, issued Ciaprazi a misbehavior report for "obstruction of visibility and harassment," which was "entirely false . . . [and] baseless." (Am. Compl. ¶¶ 17, 22, 69-72). On August 26, 2012, after a hearing resulted in a determination that he was guilty of

4

these charges, Ciaprazi appealed to defendant Capra, Sing Sing's Superintendent, and sent copies of his papers to Fischer, Governor Cuomo, and other public officials. (Am. Compl. ¶ 89; Ex. 14). The Superintendent's designee affirmed the disposition, but reduced Ciaprazi's punishment from sixteen to twelve days of keeplock. (Am. Compl. ¶¶ 87, 90). On August 28, 2012, Ciaprazi again wrote to Fischer and Capra, challenging the misbehavior report against him as "false and racially motivated," and he requested an investigation into the incident. (Am. Compl. ¶ 84; Ex. 13). Thereafter, on August 29 and September 7, 2012, Ciaprazi wrote to Fischer regarding the "misuse of the disciplinary system" to retaliate against him for the exercise of his First Amendment rights, and again requested an investigation into the underlying incident. (Am. Compl. ¶ 91; Exs. 15-16). Ciaprazi received no response to any of these letters and no subsequent action was taken. (Am. Compl. ¶ 91). As a consequence of the adverse disposition, however, Ciaprazi was "evicted from Building 5" and moved to Housing Block A, where he remains lodged. (Id. ¶¶ 88, 156).

Based on these events, Ciaprazi has asserted claims against Fischer for failing to investigate or otherwise address the "false, baseless and racially motivated report," (Count Five), and failing to investigate or otherwise address the "baseless and retaliatory affirmance" of the disposition against him and his subsequent eviction, (Count Ten).

C.    <u>Conditions of Confinement in Housing Block A</u>

The conditions in Housing Block A are even less acceptable than those in

Building 5, and there are problems regarding the air temperature and quality, toxic fumes,

and lighting protocols.[4]

In particular, Sing Sing maintains a custom of keeping the windows in

Housing Block A closed for "[eight] months or more a year," creating "very high [cell

temperatures] and . . . air unsuitable for breathing."  (Am. Compl. ¶ 157).  On October 1,

2012, Ciaprazi articulated his concerns in a letter to Fischer.  (<u>Id.</u> ¶ 166; Ex. 18).  Ciaprazi

also copied Fischer on a letter, dated February 8, 2013, in which he refuted statements

made to him by defendant Kelley, the Sing Sing Plant Superintendent, who claimed that

the temperature in Housing Block A consistently remained "between 72 and 78 degrees."

(Am. Compl. ¶¶ 14, 173-75; Ex. 19).

There also are problems with the radiators in Housing Block A.

Specifically, toxic fumes are released from heat-incompatible paint that is applied

annually to Housing Block A's radiators just before the heating season begins.  (Am.

Compl. ¶¶ 184-85).  The radiators also were painted in this way (presumably with the

same type of paint) when Fischer was the Superintendent of Sing Sing.  (<u>Id.</u> ¶ 186).

Housing Block A also has "high intensity" artificial lighting which is turned

on round-the-clock.  (<u>Id.</u> ¶ 202).  These lights, which are affixed to the ceiling, as well as

---

[4]    Until very recently, Ciaprazi was being assisted by <u>pro bono</u> counsel with respect
to certain of these aspects of his case.  (<u>See</u> ECF Nos. 86, 100, 118).  On February 9, 2015,
however, I granted counsel's request to withdraw.  (ECF No. 136).

powerful fluorescent "wall lights," are unnecessary and make sleep impossible.  (See id. ¶¶ 202-14).  On September 4, 2012, Ciaprazi addressed these concerns in a letter to Fischer.  (Id. ¶ 216; Ex. 22).  Although Fischer did not respond, Ciaprazi was interviewed by an unnamed Sing Sing official who was unable to provide Ciaprazi with any justification for the lighting policy.  (Am. Compl. ¶ 217).  Thereafter, on September 27, 2012, Bellnier wrote to Ciaprazi on Fischer's behalf, suggesting that the lighting policy had been explained to Ciaprazi and that Ciaprazi's concerns were resolved.  (Id. ¶ 218; Ex. 23).  On October 29, 2012, Ciaprazi responded to Bellnier, disputing his characterization of Ciaprazi's concerns as having been resolved.  (Am. Compl. ¶ 219; Ex. 24).

Based on these facts, Ciaprazi has asserted Eighth Amendment claims against Fischer for failing to remedy the conditions created by keeping the windows in Housing Block A closed (Count Thirteen), maintaining a custom of annually exposing inmates in Housing Block A to toxic paint fumes (Count Fourteen), and failing to change the painting process in Housing Block A (Count Sixteen).  Ciaprazi also has asserted an Eighth Amendment claim against both Fischer and Bellnier for failing to remedy the Housing Block A lighting policy.  (Count Twenty-One).

II.     Standard of Review

    A.     Motion to Dismiss

A Rule 12(b)(6) motion to dismiss for failure to state a claim "tests the legal sufficiency of [a] plaintiff's claim[s] for relief."  Krasner v. HSH Nordbank AG, 680 F.

Supp. 2d 502, 511 (S.D.N.Y. 2010).  In deciding the motion, the Court must accept as true all factual allegations made in a complaint and draw all reasonable inferences in favor of the plaintiff.  Allaire Corp. v. Okumus, 433 F.3d 248, 249-50 (2d Cir. 2006).  A complaint need not contain "detailed factual allegations."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)).  Nonetheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).

To survive a Rule 12(b)(6) motion, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Id. (quoting Twombly, 550 U.S. at 570).  Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from merely "conceivable to plausible" requires the Court to draw on its judicial experience and common sense.  Id. at 679-80.  In making this assessment, the Court may consider, in addition to a plaintiff's factual averments, any written instrument upon which the plaintiff necessarily relies, regardless of whether it is attached to the complaint or incorporated therein by reference. Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002).  Furthermore, the Court may take judicial notice of indisputable facts.  See Fed. R. Evid. 201.  Legal conclusions masquerading as factual averments, however, may not be taken into account. Twombly, 550 U.S. at 555.

The Court must read pro se pleadings "liberally" and interpret them "to raise the strongest arguments" that they may suggest.  Chavis v. Chappius, 618 F.3d 162,

170 (2d Cir. 2010) (quoting <u>Harris v. City of N.Y.</u>, 607 F.3d 18, 24 (2d Cir. 2010)).

When a plaintiff is proceeding <u>pro se</u>, the Court also may rely on materials outside the

complaint in assessing the legal sufficiency of the plaintiff's claims.  <u>See</u> <u>Crum v. Dodrill</u>,

562 F. Supp. 2d 366, 373-74 (N.D.N.Y. 2008) (citing <u>Gadson v. Goord</u>, No. 96 Civ. 7544

(SS), 1997 WL 714878, at *1 n.2 (S.D.N.Y. Nov. 17, 1997)).  Moreover, while a court

generally will not consider factual allegations advanced for the first time in opposition to

a motion, the mandate to read a <u>pro se</u> plaintiff's papers liberally makes it appropriate to

consider factual allegations in a <u>pro se</u> plaintiff's opposition papers, in addition to those in

an amended complaint, in resolving a motion to dismiss.  <u>See</u> <u>Omoniyi v. Dep't of</u>

<u>Homeland Sec.</u>, No. 10 Civ. 1344 (DF), 2012 WL 892197, at *5 (S.D.N.Y. Mar. 13,

2012); <u>Richardson v. New York</u>, No. 10 Civ. 6137 (SAS), 2012 WL 76910, at *1 n.10

(S.D.N.Y. Jan. 9, 2012).

III.    <u>Discussion</u>

    A.    <u>Personal Involvement of Fischer</u>

       To state a Section 1983 claim, a plaintiff must "show that the alleged

deprivation was committed by a person acting under color of state law."  <u>West v. Atkins</u>,

487 U.S. 42, 48 (1988).  It is settled law that a defendant's personal involvement in an

unlawful action – not mere supervisory oversight – is a prerequisite to an award of

compensatory damages under Section 1983.  <u>Provost v. City of Newburgh</u>, 262 F.3d 146,

154 (2d Cir. 2001).  The Second Circuit previously has indicated that a plaintiff may

establish the personal involvement of a supervisory defendant by showing that

> (1) the defendant participated directly in the alleged
> constitutional violation, (2) the defendant, after being
> informed of the violation through a report or appeal, failed to
> remedy the wrong, (3) the defendant created a policy or
> custom under which unconstitutional practices occurred, or
> allowed the continuance of such a policy or custom, (4) the
> defendant was grossly negligent in supervising subordinates
> who committed the wrongful acts, or (5) the defendant
> exhibited deliberate indifference to the rights of inmates by
> failing to act on information indicating that unconstitutional
> acts were occurring.

Colon v. Coughlin, 58 F.3d 865, 873 (2d Cir. 1995).

In Iqbal, the Supreme Court concluded that government officials cannot be held liable for the acts of their subordinates on a respondeat superior theory, and that plaintiffs instead "must plead that each Government-official defendant, through his own individual actions, has violated the Constitution."  556 U.S. at 676.  Since then, several judges in this District have interpreted Iqbal to render all but the first and third of the Colon factors inapplicable when determining supervisory liability.  See e.g., Bellamy v. Mount Vernon Hosp., No. 07 Civ. 1801 (SAS), 2009 WL 1835939, at *6 (S.D.N.Y. June 26, 2009) ("Only the first and part of the third Colon categories pass Iqbal's muster."); see also Grullon v. City of New Haven, 720 F.3d 133, 139 (2d Cir. 2013) (noting that Iqbal "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations") (emphasis added).  Of late, however, most judges have continued to apply Colon in its entirety, since there is no clear direction from a higher court to the contrary.  See Mercier v. Kelly, No. 10-CV-7951

(ALC) (JCF), 2013 WL 4452486, at *6 (S.D.N.Y. Aug. 19, 2013) (quoting <u>Shepherd v.</u>

<u>Powers</u>, No. 11 Civ. 6860, 2012 WL 4477241, at *10 (S.D.N.Y. Sept. 27, 2012)) ("[T]he

apparent majority view [is] that where, as here, the constitutional claim does not require a

showing of discriminatory intent, . . . the personal involvement analysis set forth in <u>Colon</u>

. . . may still apply.") (internal quotation marks omitted; first ellipsis in original).  For

purposes of this Report and Recommendation, I will follow the majority, whose reading

of Iqbal is the most helpful to Ciaprazi's case.

        1.    <u>Counts One and Two</u>

        Ciaprazi alleges that on August 7, 2012, he sent Fischer a formal complaint

describing the unconstitutional conditions of confinement in Building 5.  (Am. Compl.

¶ 57).  Although Fischer did not respond, Martuscello did so on Fischer's behalf,

addressing Ciaprazi's concerns but denying the relief Ciaprazi requested.  (<u>Id.</u> ¶ 58; <u>see</u>

Ex. 2).  Even under <u>Colon</u>, "[a] supervisory official is not deemed to have been personally

involved solely by virtue of having received a letter or complaint from a prisoner and

having referred it to the appropriate department for investigation."  <u>Phillip v. Schriro</u>, No.

12-cv-8349 (RA), 2014 WL 4184816, at *5-6 (S.D.N.Y. Aug. 22, 2014) (collecting

cases); <u>see also</u> <u>Goris v. Breslin</u>, 402 Fed. App'x. 582, 584 (2d Cir. 2010) (personal

involvement requirement not met where supervisory official's involvement was limited to

referring letters of complaint to appropriate subordinates for investigation); <u>Mateo v.</u>

<u>Fischer</u>, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010) ("If courts found personal

involvement every time a supervisor forwarded a complaint to a subordinate, the requirement would lose all meaning.").

Accordingly, because Ciaprazi acknowledges that Fischer referred his letter to Martuscello, his allegations regarding Fischer's personal involvement are, as a matter of law, insufficient to state a Section 1983 claim.  (See Pl.'s Opp. at 11).  Ciaprazi's related contention that Fischer's decision to forward his complaint to Martuscello was itself unreasonable because Martuscello ultimately failed to remedy the problem is equally meritless.  (See id. at 10).  Absent a plausible basis to believe that Fischer knew that Martuscello failed to take reasonable action, the attempt to hold Fischer responsible is nothing more than a veiled attempt to invoke respondeat superior.  Indeed, the case law cited by Ciaprazi in support of this aspect of his claim only addresses circumstances in which a supervisory official is aware of wrongful conduct by his subordinates but fails to take reasonable action.  (See Pl.'s Opp. at 10 (citing Taylor v. Michigan Dep't of Corr., 69 F.3d 76, 80 (6th Cir. 1995), and LaMarca v. Turner, 995 F.2d 1526, 1537 (11th Cir. 1993))).  Ciaprazi has not plausibly alleged that this is what occurred here.

Ciaprazi's alternative contention that "the expensive project of removing and replacing hundreds of windows could not have occurred without Fischer's approval," (id. at 11), does not salvage his claims.  Indeed, this is precisely the type of conclusory allegation that is routinely deemed insufficient to allege personal involvement on the part of a supervisory official.  See Joseph v. Fischer, No. 09-CV-6428L, 2009 WL 3805590, at

*2 (W.D.N.Y. Nov. 6, 2009) ("conclusory allegations that defendants have 'personal knowledge' of the events complained of" are insufficient to state personal involvement absent additional facts to support those allegations); <u>Colon</u>, 58 F.3d at 874 ("The bare fact that [the defendant] occupies a high position in the New York prison hierarchy is insufficient to sustain [plaintiff's] claim."). Stripped of its conclusory averments, Ciaprazi's claim amounts to an assertion that, solely by virtue of his position, Fischer must have played a role in a decision to replace the cell windows in one particular building at Sing Sing with poorly-designed windows. In the absence of any evidence supporting that allegation, it is implausible that the DOCCS Commissioner would have been so involved in the affairs of Sing Sing.[5]

Accordingly, Counts One and Two of Ciaprazi's Amended Complaint should be dismissed as against Fischer for failure to state a claim.

### 2.   <u>Counts Five and Ten</u>

In Count Five, Ciaprazi alleges that Fischer failed to take action with respect to the racially motivated misbehavior report interposed against him in August 2012. (Am. Compl. ¶ 225). In Count Ten, Ciaprazi seeks to hold Fischer liable for failing to investigate or otherwise take action with respect to Ciaprazi's retaliatory eviction from Building 5. (Id. ¶ 230). Both of these claims rely on letters that Ciaprazi

---

[5]     Ciaprazi's reliance on <u>Pugh v. Goord</u>, 571 F. Supp. 2d 477 (S.D.N.Y. 2008) is misplaced. In that case, unlike here, it was undisputed that the supervisory official had approved the decision in question. <u>Id.</u> at 513.

sent to Fischer.  (See Pl.'s Opp. at 13-17; Exs. 9, 13-16).[6]  In both instances, however, Ciaprazi has failed to make a plausible showing that Fischer was aware of the alleged underlying constitutional violations.

Ciaprazi relies primarily on the Second Circuit's 2013 decision in Grullon, to contend that he is entitled to an inference that Fischer read and considered each letter that he addressed and mailed to him.  (Pl.'s Opp. at 15-16).  To draw such an inference, would represent a significant departure from the Second Circuit's longstanding view that "an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."  Rivera v. Bloomberg, No. 11 Civ. 629 (PGG), 2012 WL 3655830, at * 9 (S.D.N.Y. Aug. 27, 2012) (quoting Johnson v. Wright, 234 F. Supp. 2d 352, 363 (S.D.N.Y. 2002)) (collecting cases).  Nevertheless, recognizing that Grullon could be read to warrant such a change, both Ciaprazi and the Defendants spend considerable time addressing that decision in their papers.  (See ECF No. 92 ("Defs.' Mem.") at 8-10; Pl.'s Opp. at 3-9).

In Grullon, the district court dismissed a pro se plaintiff's Section 1983 claims against a warden in his individual capacity for failure to plead the warden's personal involvement in the constitutional violations alleged.  720 F.3d at 133.  One

---

[6]  Although the Amended Complaint frames Ciaprazi's allegations against Fischer with respect to these two claims as sounding in deliberate indifference, his opposition papers acknowledge that he is actually seeking to establish personal involvement based on the second Colon factor, i.e., Fischer's awareness of constitutional violations that he failed to remedy.  (Pl.'s Opp. at 13-14).

critical factor leading to the Second Circuit's remand was the district court's denial of the plaintiff's request for leave to amend the complaint to include an allegation that he had sent the warden a letter describing the constitutional violations.  Id. at 141.  The district court had concluded that even if it were to consider the plaintiff's letter, "the complaint would fail because 'Grullon d[id] not allege that the [w]arden actually received the letter or whether he took any action in response to the letter." Id. at 137 (quoting Grullon v. City of New Haven, No. 3:10cv776 (SRU), 2011 WL 2680843, at *4 (D. Conn. July 8, 2011)) (first alteration in original).

        In its decision, the Second Circuit stated that the district court had erred by failing to "draw the reasonable inference . . . that the [w]arden in fact received the [l]etter, read it, and thereby became aware of the alleged conditions of which Grullon complained." Id. at 141.  Several district judges in this Circuit have taken this language to mean that merely writing to a supervisory official who fails to act now suffices to establish personal involvement at the pleading stage.  See, e.g., Jean-Laurent v. Lane, No. 9:11-CV-186 (NAM) (TWD), 2014 WL 5335981, at *9 (N.D.N.Y. Oct. 20, 2014); Selah v. Fischer, No. 9:09-CV-1363 (GLS) (DEP), 2013 WL 5603866, at *3 (N.D.N.Y. Oct. 11, 2013).  Other district judges have adhered to the view that a mere showing to that effect would be insufficient.  See, e.g., Acevedo v. Fischer, No. 12-cv-6866 (RA), 2014 WL 5015470, at *16 (S.D.N.Y. Sept. 29, 2014); Lowery v. City of New York, No. 10 Civ. 7284 (KBF), 2014 WL 2567104, at *5-6 (S.D.N.Y. June 6, 2014).  This latter view appears to be correct.

In Grullon, the court was concerned that the district judge had violated the principle that leave to amend should be granted freely unless any amendment would be futile.  See Grullon, 720 F.3d at 140.  Viewed in that light, Grullon's holding that the plaintiff's letter to the warden was "sufficient to give an indication that a valid claim might be stated" does not represent a sea change in the law, but, rather, merely a reminder that, particularly in pro se cases, judges must afford plaintiffs a sufficient opportunity to plead facts that could establish a defendant's personal involvement before dismissing civil rights complaints.  In Grullon, for example, it was possible that the supervisory defendant had not only received a letter from the plaintiff but also had responded to it.  Because the district court in Grullon denied leave to amend, the Second Circuit was deprived of an opportunity to determine whether the defendant had simply ignored the complaint or done something more.

Here, by comparison, the Amended Complaint and Ciaprazi's opposition papers concede that Fischer ignored Ciaprazi's letters.  Any amendment in these circumstances would therefore be futile.  Accordingly, Counts Five and Ten should be dismissed as against Fischer for failure to plausibly allege his personal involvement.

3.    Count Thirteen

Count Thirteen relates to the poor air quality and high temperature in Housing Block A.  Ciaprazi advances two theories why Fischer should be held individually responsible for these conditions.  First, Ciaprazi alleges that he notified Fischer of his concerns in two letter-complaints dated October 1, 2012, and February 8,

16

2013.  (Am. Compl. ¶¶ 166, 175; Exs. 18-19).  Relying on <u>Grullon</u>, Ciaprazi contends that he is entitled to an inference that Fischer read those letters and consequently was aware of the substandard conditions in Housing Block A.  (Pl.'s Opp. at 17).  For the reasons set forth previously, the mere allegation that Ciaprazi mailed two letters of complaint to Fischer is insufficient under <u>Colon</u> to establish Fischer's personal involvement.

Additionally, Ciaprazi suggests that the window opening mechanisms in Housing Block A already were broken, and that the practice of keeping the windows closed already was in place, during Fischer's tenure as Sing Sing's Superintendent.  He alleges that Fischer consequently was aware of the substandard conditions there.  (Pl.'s Opp. at 17).  Ciaprazi further alleges that during this time he expressly advised Fischer of similarly unsatisfactory conditions in Housing Block B of Sing Sing in a letter to which Fischer <u>did</u> respond.  (<u>Id.</u>; Ex. 20 (letter to Sing Sing Superintendent dated Mar. 27, 2006)).  While there may be a number of problems with this alternative theory, not the least of which is the statute of limitations, at this preliminary stage, these allegations are sufficient to plausibly allege Fischer's personal involvement.

4.    <u>Counts Fourteen and Sixteen</u>

Counts Fourteen and Sixteen of the Amended Complaint relate to the paint fumes emanating from the radiators in Housing Block A.  Ciaprazi alleges that the "custom of exposing the prisoners to toxic paint" either began while Fischer was the Sing Sing Superintendent or was "sanctioned and maintained" during his tenure.  (Pl.'s Opp. at

17

18; Am. Compl. ¶ 186).  The allegation that the paint fumes are toxic is wholly

conclusory and, thus, not something that the Court can consider in determining the facial

sufficiency of these claims.  In any event, even if the Court were to ignore this problem,

Ciaprazi has failed to suggest any reason why Fischer necessarily would have been aware

of this alleged violation, instead asking the Court to infer that simply because he was the

Superintendent, Fischer must have played a role in the decision to paint the radiators in a

certain way.  Simply put, this is implausible.  Ciaprazi also has not suggested that he or

anyone else alerted Fischer to a potential problem concerning the radiators.  Accordingly,

even under Ciaprazi's expansive interpretation of Grullon, he has failed to meet his

burden here.  Counts Fourteen and Sixteen of the Amended Complaint consequently

should be dismissed as against Fischer.  See Blake v. Kelly, No. 12 Civ. 7245 (ER), 2014

WL 4230889, at *4 (S.D.N.Y. Aug. 26, 2014) (conclusory allegations that police

commissioner was "aware of and acquiesced to the unlawful practices," without further

factual support, are insufficient to sustain plaintiff's burden to plead defendant's personal

involvement).

     5.    <u>Count Twenty-One</u>

       Ciaprazi's final claim concerning Housing Block A relates to the use of

artificial lighting in the cell block all day and night.  The sole allegation with respect to

Fischer's personal involvement is that Ciaprazi wrote to Fischer on September 4, 2012,

concerning his complaint regarding the lights.  (Am. Compl. ¶ 216).  As Ciaprazi

acknowledges, however, Bellnier responded to that letter on Fischer's behalf.  (Id. ¶ 218;

Pl.'s Opp. at 19).  Therefore, this claim must be dismissed because the record shows that

Fischer "referred [Ciaprazi's letter] to the appropriate department for investigation."

Phillip, 2014 WL 4184816, at *5-6.

       B.     Personal Involvement of Martuscello and Bellnier

       Turning to the personal involvement of Martuscello and Bellnier, the

Defendants contend that Ciaprazi has not adequately pleaded their personal involvement

because it is insufficient to allege that a supervisory official failed to act "in response to

letters of protest."  (Defs.' Mem. at 11 (quoting Partee v. Grood, No. 06 Civ. 15528

(SAS), 2007 WL 2164529, at *5 (S.D.N.Y. July 25, 2007)).  Ciaprazi, on the other hand,

maintains that by responding to his complaints on behalf of Fischer, both Martuscello and

Bellnier became personally involved in the alleged constitutional violations.  (Pl.'s Opp.

at 12-13, 19).

       The Second Circuit has noted that it is "questionable whether an

adjudicator's rejection of an administrative grievance would make him liable for the

conduct complained of."  Burton v. Lynch, 664 F. Supp. 2d 349, 360 (S.D.N.Y. 2009)

(quoting McKenna v. Wright, 386 F.3d 432, 437 (2d Cir. 2004)).  Courts have, however,

found the requisite level of personal involvement when a defendant actually reviewed and

responded to a plaintiff's complaint or undertook an investigation.  Id.  Here, Ciaprazi

alleges that both Martuscello and Bellnier took some affirmative steps to look into

Ciaprazi's complaints.  Martuscello, for example, is alleged to have explained to Ciaprazi

that the new windows in Building 5 were in fact suitable for a facility without air-

conditioning and that the relief Ciaprazi sought was either unnecessary or unavailable. (See Pl.'s Opp. at 12-13; Ex. 2).  Similarly, Bellnier is alleged to have indicated that he was not only aware of Ciaprazi's claim but had conferred with third parties to assure himself that Ciaprazi's concerns were resolved.  At this stage, this is sufficient to permit Ciaprazi's claims against Martuscello and Bellnier to proceed.  See Ocampo v. Fischer, No. 11-CV-4583 (CBA) (MDG), 2014 WL 7422763, at *7 (E.D.N.Y. Dec. 31, 2014) (personal involvement sufficiently stated because allegations suggest defendant "not only received letters . . . but also responded to them").

      C.      Qualified Immunity of the Albany Defendants

      The Albany Defendants seek dismissal of the money damages claims brought against them in their individual capacities on the basis of qualified immunity. Pursuant to that doctrine, government actors performing discretionary functions are shielded from civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995) (citing Harlow v. Fitzgerald, 457 U.S. 800, 817-18 (1982)).

      Arguably displaying greater creativity than logic, the Albany Defendants assert that they are entitled to qualified immunity because there is no clearly established law as to whether receiving grievances but failing to act on them establishes personal involvement.  (See Defs.' Mem. at 15-16).  As Ciaprazi correctly notes however, this argument incorrectly focuses upon whether the law concerning personal involvement is

clearly established, rather than whether there is clearly established law concerning the

First, Eighth, and Fourteenth Amendments rights giving rise to Ciaprazi's claims.  (Pl.'s

Opp. at 21-22).  At this early stage of the litigation, there is nothing to suggest that the

rights that Ciaprazi claims were violated were not well established.  Any ambiguity that

may exist with respect to the degree of involvement needed to establish personal

involvement is therefore not a basis upon which the Albany Defendants can invoke

qualified immunity.

> D.     Dismissal of State Law Claims

Finally, the Defendants contend that Ciaprazi's state law tort claims are

barred by Section 24 of the New York Correction Law.  (Defs.' Mem. at 16-17).  That

statute provides that:

> No civil action shall be brought in any court of the state . . .
> against any officer or employee of [DOCCS], which for
> purposes of this section shall include members of the state
> board of parole, in his or her personal capacity, for damages
> arising out of any act done or the failure to perform any act
> within the scope of the employment and in the discharge of
> the duties by such officer or employee.

N.Y. Correc. Law § 24(1).  Although, the statute precludes any recovery of money

damages against persons such as the Defendants, persons aggrieved may bring their

claims against the State in the New York State Court of Claims.  Id. § 24(2); see Rucano

v. Koenigsmann, No. 9:12-cv-00035 (MAD) (RFT), 2014 WL 1292281, at *15

(N.D.N.Y. Mar. 31, 2014) ("[B]ecause the Court of Claims is a court of limited

jurisdiction, hearing only claims against New York State and no other individual or entity, § 24 amounts to a grant of immunity for corrections officers sued in their personal capacities for claims arising out of the discharge of their duties.") (citing N.Y. Ct. Clms. Law § 9).

A federal court exercising pendent jurisdiction over a state law claim must apply state law.  United Mine Workers v. Gbbs, 383 U.S. 715, 726 (1996).  Accordingly, the Second Circuit held in Baker v. Coughlin, 77 F.3d 12 (1996), that DOCCS officers facing state law claims in federal court "are entitled to invoke the benefits of § 24 irrespective of the forum in which [the plaintiff] chooses to pursue her claims."  Id. at 15-16.  As a consequence, if a claim would be subject to dismissal in state court pursuant to Section 24, this Court also must dismiss that claim.  Baker, 77 F.3d at 16; see Muhammad v. Jenkins, No. 12 Civ. 8525 (CM), 2013 WL 5225573, at *6 (S.D.N.Y. Sept. 13, 2013); Brown v. Dep't of Corr. Servs., No. 09-CV-00949S (F), 2011 WL 2182775, at *9 (W.D.N.Y. June 2, 2011).

Ciaprazi does not dispute that the Defendants are or were officers or employees of DOCCS who were acting within the scope of their employment.  (See Pl.'s Opp. at 23-25).  Nevertheless, citing the Supreme Court's recent decision in Haywood v. Drown, 556 U.S. 729 (2009), Ciaprazi contends that Section 24 is unconstitutional.  (Pl.'s Opp. at 24-25).  In Haywood, the Supreme Court held that Section 24 violates the Supremacy Clause of the United States Constitution to the extent that it is used to "shut the [state] courthouse door to federal claims."  Haywood, 556 U.S. at 741 (emphasis

added).  Here of course, the circumstances are reversed since the Defendants seek to rely on Section 24 to avoid litigating Ciaprazi's <u>state law</u> claims in federal court.  This application of the statute does not raise any Supremacy Clause concerns.  <u>See</u> <u>Eldridge v. Williams</u>, No. 10 Civ. 0423 (LTS), 2013 WL 4005499, at *15 (S.D.N.Y. July 30, 2013) ("[B]ecause the law provides immunity only from state law claims and it does not purport to restrict any federal laws, the Supremacy Clause does not affect its validity.").  Accordingly, as New York law requires, Ciaprazi's state law claims seeking monetary damages against the Defendants must be dismissed.[7]

## IV.   Conclusion

For the foregoing reasons, the Defendants' motion, (ECF No. 91), should be granted in part and denied in part.  Specifically, Ciaprazi's First, Second, Fifth, Tenth, Fourteenth, Sixteenth, and Twenty-First claims for relief should be dismissed against Fischer.  Additionally, Ciaprazi's Twenty-Second, Twenty-Third, and Twenty-Fourth claims for relief should be dismissed as against all the Defendants.

## V.   Notice of Procedure for Filing Objections to this Report and Recommendation

The parties shall have fourteen (14) days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  <u>See also</u> Fed. R. Civ. P. 6(a) and (d).  Any

---

[7]      Because a federal court may not "order prospective relief to remedy an asserted violation of state law only," injunctive relief also is not available with respect to Ciaprazi's state law claims against the Defendants.  <u>Handberry v. Thompson</u>, 436 F.3d 52, 63 (2d Cir. 2006); <u>see</u> 18 U.S.C. § 3626(a)(1)(A).

such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Valerie E. Caproni and to my chambers at the United States Courthouse, 500 Pearl Street, New York, N.Y. 10007, and to any opposing parties. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be directed to Judge Caproni.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  See Thomas v. Arn, 474 U.S. 140 (1985); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).

Dated:      New York, New York
            February 24, 2015

_____
            FRANK MAAS
      United States Magistrate Judge